Page 1

```
          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF OHIO
               WESTERN DIVISION
            CASE NO. C-1-02-457
                    - - -

RICK DEES,         -vs-   KENWOOD DEALER
                          GROUP, INC. and
                          KINGS DODGE, INC.
 Plaintiff,               Defendants.
                    - - -

      Deposition of RICKY DEES, the Plaintiff
herein, taken by the Defendants as upon
cross-examination and pursuant to the Federal Rules of
Civil Procedure and agreement of counsel as to time
and place and stipulations hereinafter set forth at
the offices of Cors & Bassett, LLC, 537 East Pete Rose
Way, Suite 400, Cincinnati, Ohio, on Tuesday,
January 7, 2003, at 10:14 a.m., before Brenda R.
Whitney, RPR, RMR, a Notary Public within and for the
State of Ohio.
                    - - -
```

Page 2

```
                    I N D E X
Witness:
RICKY DEES
Cross-Examination by:                        Page:
      Curtis L. Cornett, Esq.          6, 191, 202
Examination by:
      Paul H. Tobias, Esq.                183, 199


Defendants' Exhibits:                    Page Marked:
No. 1............................................. 12
      (Resume of Rick Dees)
No. 2............................................. 38
      (Application for Employment 10/29/99)
No. 3............................................. 39
      (Court records)
No. 4............................................. 61
      (Omnia 720 Composite)
No. 5............................................. 69
      (Affidavit of Rick Dees)
No. 6............................................. 69
      (EEOC Questionnaire of Ricky Dees)
No. 7............................................. 74
      (Plf.'s Answers to Dft.'s First Set of Interr.)
No. 8............................................. 93
      (Two pages of math test)
No. 9............................................. 93
      (9/20/00 handwritten letter from Mr. Pittman)
No. 10............................................ 108
      (Kenwood Dealer Group, Inc. Employee Handbook
```

Page 3

```
No. 11............................................ 135
      (Charge of Discrimination 8/31/2000)
No. 12............................................ 135
      (Charge of Discrimination 11/9/2000)
No. 13............................................ 136
      (2/28/02 letter to Ms. Javey & Mr. Robinson from
      Rick Dees)
No. 14............................................ 145
      (7/16/01 letter to Mark Pittman from Rick Dees)
No. 15............................................ 148
      (Daily Planner)
                    - - -
```

Page 4

```
APPEARANCES:
      For the Plaintiff:
            Paul H. Tobias, Esq.
                  of
            Tobias, Kraus & Torchia
            911 Mercantile Library Building
            414 Walnut Street
            Cincinnati, Ohio  45202
            Phone: (513) 241-8137

      For the Defendants:
            Curtis L. Cornett, Esq.
                  of
            Cors & Bassett, LLC
            537 East Pete Rose Way
            Suite 400
            Cincinnati, Ohio  45202
            Phone: (513) 852-8226

      Also Present:
            Robert C. Reichert
                  - - -
```

EXHIBIT A

Page 141

1 telephones, but no, I didn't say specific. In fact, I
2 talked about possibly answering phone calls or working
3 internet leads, just accommodate me at the time.
4    Q    You didn't have any discussion with
5 anyone at Kings Dodge about the fact that they already
6 had a receptionist and they didn't need one, you
7 nonetheless insisted you should be the receptionist?
8    A    That was Mark Pittman's response,
9 you know, when I asked to accommodate my needs and
10 that my doctor had requested.
11   Q    What was Mark Pittman's --
12   A    He already has a receptionist.
13   Q    What was your response to
14 Mr. Pittman when he told you they already had a
15 receptionist?
16   A    How about working the internet
17 leads?
18   Q    Did you not want Kings Dodge to
19 replace the current receptionist with you, sir?
20   A    No.
21   Q    You didn't request Mr. Pittman to do
22 that?
23   A    No.
24   Q    Why did you resign in July of 2001?
25   A    To pursue other career paths.

Page 142

1    Q    No one in management asked you to
2 leave, did they, sir?
3    A    No.
4    Q    Before you left you -- in July of
5 2001, you spoke with Mr. Reichert that day, didn't
6 you?
7    A    Yes.
8    Q    Okay. The day -- your last day of
9 work?
10   A    Yes.
11   Q    Mr. Reichert told you that you were
12 a valued employee. They were very happy with your
13 performance as a salesperson on that day, didn't he?
14   A    I don't recall that. In fact,
15 Mr. Reichert asked me what would it take -- when I
16 presented my resignation letter, what would it take
17 for me to leave that day, not the two-week notice that
18 I was giving.
19   Q    Did he tell you why he wanted -- he
20 might want you to leave that day instead of two weeks
21 from now?
22   A    I figured he was angry, but he
23 offered me pay to leave.
24   Q    Okay. Your vacation pay? Isn't
25 that right, sir?

Page 143

1    A    Yeah. What it was proposed as, my
2 vacation pay.
3    Q    Did you think there was something
4 else?
5    A    Well, I mean, I hadn't worked --
6 hadn't worked since -- I was on medical leave for
7 12 weeks from February to June. I don't know if I
8 really deserved vacation pay. I had used my vacation
9 pay -- vacation time up in the year 2000 so -- 2001 I
10 don't think it was -- I don't have time worked. I
11 think they do -- in Kenwood Dealer Group how they give
12 you vacation time, I think it's per every 40 hours
13 they might give you three or four hours -- I'm not
14 sure -- during the year. I don't know how they come
15 up with that.
16   Q    So you just thought it was an
17 incentive then for you to leave that day instead of
18 two weeks?
19   A    I'm certain it was incentive.
20   Q    Did you have any idea why they
21 wanted you to leave then instead of two weeks?
22   A    Mr. Reichert was angry. Other than
23 that, I don't know any reason why. I mean, I was
24 going through the correct procedures that any good
25 performing employee would do, you know, submit a

Page 144

1 two-week notice.
2    Q    You hadn't been having any conflicts
3 with any of the other employees?
4    A    No.
5    Q    At the entire time you were employed
6 at Kings Dodge did you ever hear anybody make a racial
7 slur regarding you?
8         MR. TOBIAS: Regarding him?
9         MR. CORNETT: Yes.
10   A    No. I heard racial connotations
11 about customers but not about myself.
12   Q    Did you ever hear Mark Pittman make
13 any type of racial slur about anyone?
14   A    No.
15   Q    Did you ever hear Mr. Reichert make
16 any type of racial slur about anyone?
17   A    No.
18   Q    Did you hear anyone in a
19 management-level position make a racial slur about
20 anyone?
21        MR. TOBIAS: He personally hear?
22        MR. CORNETT: Yes.
23   A    No.
24   Q    Did anyone ever tell you that the
25 reason you failed to get any of these managerial jobs

### Page 197

```
 1    A     Yes --
 2    Q     -- employed by one the dealerships?
 3    A     -- I would assume.
 4    Q     Be fair to characterize him as a
 5  disgruntled ex-employee?
 6    A     I don't know.  I don't know.
 7    Q     Other than watching you clock in and
 8  out, what did Mike Wilson do that you consider to be
 9  him picking on you?  And calling you not a team player
10  one day.
11    A     There probably was a series of
12  occasions that I didn't mark down in my book, you
13  know, but, I mean, he was always hostile towards me.
14    Q     How?
15    A     Just -- his entire demeanor.  It was
16  as though he didn't really want to work with me.  Any
17  time I worked with -- you know, I brought a deal to
18  the desk for him to desk, attempted to sell a car, it
19  was always a difficulty just with every-day
20  communication with Mike Wilson.
21    Q     Can't give me one example though?
22    A     I just gave you an example,
23  Mr. Cornett.  I mean, just as simple as his
24  responsibility was to manage and sell used cars, and
25  if I had a customer on a lot and I'm attempting to get
```

### Page 198

```
 1  information and -- and work a deal, it was just
 2  difficult for him to just, you know, work a deal for
 3  me.  It was kind of like he didn't want to work the
 4  deal.
 5    Q     Did he ever refuse to work a deal
 6  with you?
 7    A     No.
 8    Q     Did he ever refuse to give you
 9  information that you requested from him?
10    A     No.
11    Q     This depression and unhappiness that
12  you discussed with Mr. Tobias, are you over that now
13  or are you still depressed and unhappy about this
14  issue?
15    A     I'm over it now.
16    Q     When you went into Mr. Pittman's
17  office in July and told him why you were resigning,
18  you told him you were resigning because you wanted to
19  change careers, right?
20    A     I gave him a letter just stating
21  that I was resigning.  I didn't share with him.
22    Q     You didn't tell him that you wanted
23  to change careers?
24    A     No.
25    Q     Tell Mr. Reichert that later that
```

### Page 199

```
 1  day?
 2    A     No.
 3    Q     Did he even ask why you were
 4  resigning?
 5    A     Mr. Pittman acknowledged that he had
 6  got a reference call from a bank, but I don't -- you
 7  know, but I didn't tip off anything to him in
 8  reference to where I was going or what I was doing,
 9  no.
10    Q     Okay.  But that is the reason you
11  resigned?  You wanted to change careers?
12    A     Yes.  Yes.
          MR. CORNETT:  That's it.
          EXAMINATION (CONTINUED)
    BY MR. TOBIAS:
      Q     Just couple -- one other question.
    October 2nd.  Take a look at October 2nd.
      A     Um-hum.
      Q     There's a notation about Wilson?
      A     Um-hum.
      Q     Was that something you recall from
    time to time he -- when you were late or something --
    made mention of it?
      A     Yes, always.
      Q     Did you notice unequal treatment of
```

### Page 200

```
 1  African American employees other than yourself?
 2          MR. CORNETT:  Objection.
 3    A     Yes.
 4          MR. CORNETT:  Lack of foundation.
 5    Q     What did you observe other than
 6  you've already testified to?
 7    A     Again, we were always held under a
 8  different set of rules than the -- my counterparts or
 9  white males.
10    Q     You remember some instances that you
11  can -- examples of that?
12    A     Yes, selection and choices of
13  demonstrators driven.  Again, when come to working an
14  opportunity or -- you know, sell a car with
15  Mike Wilson, he could, you know, really take his time
16  about giving us the information needed.
17    Q     Take a look at August 14th.  Have
18  you testified about that?  I don't remember if you
19  have.  Do you remember that -- some incident around
20  that time period?
21    A     Yes.
22    Q     What was that?
23    A     Again, it was a Saturday when I was
24  unable to sell a car.  That's what we were referring
25  to.  If you notice I wrote 8/12 on the date.  But
```

LEXSEE

SHIRLEY ANN WHITE, Plaintiff-Appellant, v. THE DIAL CORPORATION, Defendant-Appellee.

No. 94-2448

UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

1995 U.S. App. LEXIS 7838

February 22, 1995, Argued
April 6, 1995, Decided

**NOTICE:** [*1] UNPUBLISHED ORDER NOT TO BE CITED PER SEVENTH CIRCUIT RULE 53.

**SUBSEQUENT HISTORY:**

Reported in Table Case Format at: *52 F.3d 329, 1995 U.S. App. LEXIS 18603.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 91 C 6058. Milton I. Shadur, Judge.

**DISPOSITION:** AFFIRMED.

**LexisNexis(R) Headnotes**

**JUDGES:** Before Honorable FRANK H. EASTERBROOK, Circuit Judge, Honorable KENNETH F. RIPPLE, Circuit Judge, Honorable ILANA DIAMOND ROVNER, Circuit Judge

**OPINION:**

ORDER

Shirley Ann White sued her employer, the Dial Corporation, contending that she had been subjected to sexual discrimination in the form of a hostile working environment that forced her to transfer to another position within the company offering inferior pay opportunities. n1 The district court entered summary judgment in favor of Dial, from which White appeals. Our review is of course de novo. *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994). Because we conclude that the record was insufficient to establish that White was "constructively transferred" from her former position, we agree that summary judgment in favor of the defendant was required.

 n1 White's complaint also asserted a claim against her union, United Food & Commercial Workers Local 100-A, AFL-CIO & CLC. That claim was dismissed by the district court and White has not appealed that dismissal.

[*2]
I.

White has worked at Dial's plant in Montgomery, Illinois for just over twenty years. During the majority of her employment at Dial, White has worked in the Soap Finishing Department. However, for a period of about ten weeks in 1989, White worked in the Chemical Processing Department. It is White's brief tenure in this department that gave rise to this suit.

White successfully bid for the job of Process Material Handler or "A-5 Operator" in January 1989 and began work in Chemical Processing the following month. The principal duties of an A-5 Operator include unloading raw materials from railroad cars, pretreating them, and storing them after processing. We are told this is considered a "plum" position among Dial employees: the pay is superior to most other jobs within the plant and A-5 operators enjoy greater opportunities for advancement.

Throughout most of her tenure as an A-5 operator, White was the sole woman to hold the position. She

EXHIBIT B

alleges, in fact, that her supervisors and co-workers in Chemical Processing were averse to women in that job, and that their hostility manifested itself in the following discriminatory practices:

> 1) White was denied salary increases [*3] reflecting the knowledge and skills she acquired with training;
>
> 2) supervisors and fellow workers commented repeatedly that the A-5 position was "not a woman's job";
>
> 3) she was given inadequate safety instruction;
>
> 4) she was berated and cursed by her co-workers, despite their knowledge that she is deeply religious;
>
> 5) she was denied breaks during her eight-hour shifts that her male co-workers were permitted to take;
>
> 6) she was not, unlike males, permitted to work overtime; and
>
> 7) she was followed and monitored by her supervisors to a degree that men were not.

Ultimately, White decided to transfer back to the Soap Finishing Department, effective April 17, 1989. When she resumed work in Soap Finishing, White appears to have earned an hourly wage higher than her compensation as an A-5 trainee. However, had she completed that training and remained in Chemical training, her base pay as an A-5 operator would have been greater than her base pay in Soap Finishing. n2

> n2 White's other employment benefits remained the same upon her return to Soap Finishing.

[*4]

II.

Dial did not order White transferred from the Chemical Process Department to the Soap Finishing Department; she did so on her own. When a plaintiff has elected to resign from employment with the defendant, she normally cannot obtain reinstatement and back pay (the two remedies that White seeks n3) unless she succeeds in proving that she was constructively discharged -- that is, that her employer made her working conditions so intolerable that a reasonable person would have felt she had no real choice but to quit. *Chambers v. American Trans Air, Inc., 17 F.3d 998, 1005 (7th Cir.), cert. denied, 115 S. Ct. 512, 130 L. Ed. 2d 419 (1994); Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 536-37 (7th Cir. 1993); see also, e.g., Landgraf v. USI Film Prod., Inc., 968 F.2d 427, 429 (5th Cir. 1992), aff'd on other grounds, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994); Maney v. Brinkley Mun. Waterworks & Sewer Dep't, 802 F.2d 1073, 1075 (8th Cir. 1986).* n4 Whether an employee can secure reinstatement and backpay by showing that she was constructively *transferred* is a question we have not previously decided, but for present purposes we shall assume that the answer is yes. Even [*5] so, our review of the record n5 leads us to conclude that a reasonable factfinder could not find that White's working conditions were so intolerable as to force a reasonable person to quit or transfer. n6 On that basis alone, we believe the district court was correct to enter summary judgment in favor of Dial.

> n3 The discriminatory experiences of which White complains pre-dated the 1991 Civil Rights Act, which broadened the remedies available to Title VII plaintiffs. *See Landgraf v. USI Film Prod., Inc., 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994).*
>
> n4 We have not yet decided (and we need not do so here) whether the employer must have "manipulated the attributes of the job *for the purpose of* driving the employee to quit." *Henn v. National Geographic Soc., 819 F.2d 824, 829 (7th Cir.)* (emphasis supplied), *cert. denied, 484 U.S. 964, 108 S. Ct. 454, 98 L. Ed. 2d 394 (1987).*
>
> n5 Unfortunately, our review has been hampered by White's failure below to file a proper response to the factual statement Dial submitted in compliance with the Northern District of Illinois' Local General Rule 12(m). Contrary to the provisions of Rule 12(n), White merely peppered her memorandum in opposition to summary judgment with footnotes bearing citations to the record, without responding directly and individually to each of the assertions in Dial's 12(m) statement. Although White did tender a separate factual statement of her own, it was in no way responsive to Dial's factual summary, and in a number of instances merely duplicated Dial's own assertions. *See* District Court's Mem. Op. and Order at 2, n.2. This approach was wholly improper, and the district court would have been well within its discretion to strike White's papers. *See generally Waldridge*

*v. American Hoechst Corp.*, 24 F.3d 918, 923-24 (7th Cir. 1994). **[*6]**

n6 To succeed in establishing a constructive discharge or transfer, White must show that not only that she perceived her environment in Chemical Processing to be abusive, but that a reasonable person would have so perceived it as well. *Harris v. Forklift Sys., Inc.*, 126 L. Ed. 2d 295, 114 S. Ct. 367, 370 (1993); *Saxton*, 10 F.3d at 534. We shall assume that the evidence was sufficient to support the inference that White found the atmosphere in Chemical Processing to be unbearable, and shall focus our analysis on whether a reasonable person would have found it so as well.

White's underlying theory of Title VII theory is that of the hostile work environment, defined as a "workplace [which] is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 126 L. Ed. 2d 295, 114 S. Ct. 367, 370 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 **[*7]** (1986)). Circumstances that might be adequate to establish a hostile working environment for purposes of Title VII will not necessarily suffice to establish a constructive discharge. *Landgraf*, 968 F.2d at 430; *Miller v. Illinois*, 681 F. Supp. 538, 544 (N.D. Ill. 1988). Conduct that detracts from an individual's work performance, hinders her advancement, or *discourages* her from remaining on the job can suffice to establish a hostile environment, *Harris*, 114 S. Ct. at 370-71; but in order to establish a constructive discharge, the severity or pervasiveness of the abuse must be so great as to *compel* the reasonable person to resign. *Saxton*, 10 F.3d at 536-37.

The district court found the record wanting in support even for a claim of hostile environment, and we share many of its reservations. In a number of instances, White has proffered evidence that she may have been treated unfairly, but the evidence does not necessarily suggest that she was so treated based on her gender. For example, one of White's principal claims is that she was denied interim pay raises based on the skills she acquired as an A-5 trainee. Dial had a written guide outlining the raises **[*8]** A-5 trainees were to receive based on the acquisition of particular skills (R. 68, Def. Ex. B at 51); other employees did receive such raises *(id.* at 136-150); and, according to White, one of her superiors acknowledged that she should have been given an interim raise (White Tr. 149, 249, 413, 415). Yet, at least two male A-5 operators testified that they did not receive raises until they completed their training and were proficient in *all* aspects of the job (Martinez Tr. 18, Beach Tr. 23), a point that White never reached *(see* White Tr. 253, acknowledging that she had not yet been trained to operate centrifuge). Indeed, one of them noted resentment among A-5 operators about the fact that other employees (both male and female) were qualified for pay raises far more quickly than they had been. Beach Tr. 21, 64. Consequently, there is no direct basis, at least, for inferring that White was denied interim raises because of her gender.

White also contends that she was denied work breaks, and at her deposition, she recounted a statement purportedly made by supervisor Don Huber to the effect that the A-5 operator position was an eight-hour job that did not permit breaks. White **[*9]** Tr. 64, 66. White also recalls co-worker and trainer Juan Martinez admonishing her on her first day as an A-5 trainee not to take a break, although he later seems to have relented and told her she could take a break when the task he assigned her was completed. White Tr. 63. White concedes that she was able to take a 30-minute break when she worked the 8 a.m. to 4 p.m. shift, but contends that she never was permitted to take "full" breaks or to take breaks at her own discretion. White Tr. 74. But it is not clear that she was singled out as a woman in this respect. Carl Cox testified that breaks did sometimes require supervisor approval and were contingent on the nature of the work an employee was performing. Cox Tr. 23. John Stathis confirmed that the A-5 job was a relatively demanding job that was not amenable to regular breaks, and he appeared to suggest that A-5 operators had to take their breaks at their own peril. *See* Stathis Tr. 38, *see also* Huber Tr. vol. II at 51-57.

White also contends that she was excessively supervised, to the extent that supervisor Huber even followed her to the restroom (although not *into* it), or was waiting for her outside when she emerged, **[*10]** on a number of occasions. White Tr. 76-82, 301, 357-58. Huber acknowledged that he monitored employees under his supervision closely, and he appears to have acknowledged that he might inadvertently have followed an employee who happened to be on his or her way to the bathroom. Huber Tr. vol. II at 31, 32-33. But whether he hovered about White in particular is uncertain. White's counsel did not explore this subject with her co-workers, and none of them volunteered information as to whether Huber followed them to the same extent he did White. Thus, we are again left without a basis for inferring that White was singled out as a woman.

White's evidence is stronger insofar as it concerns gender-based comments made to her during her tenure as an A-5 operator. On her first day of work in Chemical Processing, White recalled, co-worker Juan Martinez asked, "Why did you bid out here? This is really a dirty job. This is not a job for a woman." White Tr. 55. Martinez purportedly made similar observations about the A-5 Operator position not being a "woman's job" on other occasions (White Tr. 110, 405-07), as did co-worker Lorenzo Beach (Beach Tr. 43-44, as quoted in Opening Br. at 17). Dan Huber [*11] purportedly made these same types of remarks. According to White, Huber gave her a "safety talk" on her first day during which he too warned her that the A-5 job was cold and dirty (White Tr. 167); "he stressed that it's not a woman's job because there hadn't been [any] women[] out there that stayed" (White Tr. 168). n7 On another occasion, after Huber learned that White had complained to management about not being given breaks and not being permitted to speak to a security guard following an accident, Huber allegedly cursed at White and told her, "'You don't do that. You don't never go to my supervisor and tell them nothing. You just -- Stupid women come out here in this department trying to take over.'" White Tr. 107-08. According to White, he went on: "'You stupid, these stupid women trying to come out here and take men's jobs, stirring up a whole lot of -- blank -- 'troubles'. He was really upset. 'You should be in Soap Finishing with the women.'" White Tr. 109. White indicated that Huber repeated these remarks on another occasion, after she had spoken to Dan Ferrario. White Tr. 314. In yet another incident, after White had again gone to Huber's superiors concerning her failure [*12] to receive interim pay increases, Huber "hit the ceiling." White Tr. 413-14. "He was cursing and swearing and -- 'cause I had gone to his supervisor over him to tell him about the raise. 'You don't go to nobody else. You think this is not -- I'm not doing what I'm supposed to do, then you go back where the women[] [are] at, at Soap Finishing." White Tr. 414. White believed that Huber made similar comments in other instances, although she could not recall the details. White Tr. 169-70. n8 White recounted another incident in which John Stathis, upset upon discovering that White had not completed a task he had assigned to her, told her to "carry your broom back to Soap Finishing. This is not a woman's job." White Tr. 206; *see also id.* at 210-11. Stathis acknowledged that he "may have" expressed his opinion about women as A-5 operators, but said he couldn't recall having done so. Stathis Tr. 33.

> n7 The district court seemed to think that White conceded that Huber had *never* remarked that the A-5 position was not a woman's job. *See* Mem. Op. and Order at 19 & n.22. Viewed in context, however, it appears that White merely meant that she couldn't recall Huber making this particular remark after a given point in time. *See* White Tr. 334, 338. In fact, as the discussion above reveals, White did attribute a number of sexist remarks to Huber. [*13]

> n8 White contends that Martinez acknowledged overhearing one of Huber's remarks, but the relevant pages of his deposition have not been included in the record before us.

These remarks certainly support an inference that several of White's co-workers and supervisors were dubious about, and even resentful of, women working in Chemical Processing and were not reluctant to let White know as much. Dial attempts to discount many of these remarks, suggesting that they were spoken out of concern for White or frustration with her failure to complete her work or honor the chain of command. The context of a particular remark might possibly be relevant to an assessment of its discriminatory impact, particularly when the remark is an isolated one; yet, a sexist remark is no less so simply because it is made out of concern or frustration rather than a conscious intent to taunt or offend. In any event, White's testimony suggests a pattern of remarks reflecting an animus toward women, and we agree that such a pattern lends some support to her claim of a hostile working environment.

One might also argue [*14] that Huber's purported animus to White as a female worker should be read into his supervisory decisions concerning her entitlement to interim pay raises, breaks, and overtime opportunities. For example, according to White, when Huber discovered that White had spoken with his supervisor about a raise, "he told me that I don't get a raise until he say[s] I get a raise." White Tr. 248; *see also id.* at 267-68, 414 ("I'm not going to give you a raise. I don't care who you go to."). It was during this same heated conversation, according to White, that Huber suggested she return to Soap Finishing, "where the women[] were," White Tr. 414.

But even if we assume arguendo that such inferences would go some way toward presenting a triable claim of a hostile work environment, we are not persuaded that White has presented enough evidence to survive summary judgment on the question of constructive transfer. On that question, White's burden is to tender evidence from which a jury might conclude that her work environment was so discriminatorily hostile that a reasonable person in her position would have felt

compelled to resign or transfer out of the A-5 position. *See Chambers, 17 F.3d at 1003-04.* [*15] "Enforced idleness or a humiliating experience, as well as one that may permanently impair an employee's professional skills, may be considered when determining if a constructive discharge has occurred, and additional consideration may be given to whether there has been a pattern of discriminatory treatment over time directed toward the employee." *Marcing v. Fluor Daniel, Inc., 826 F. Supp. 1128, 1141 (N.D. Ill. 1993)* (citing *Taylor v. Western & Southern Life Ins. Co., 966 F.2d 1188, 1193-94, 1199 (7th Cir. 1992),* and *Rutan v. Republican Party of Illinois, 868 F.2d 943, 950 (7th Cir. 1989)* (en banc), aff'd in part, rev'd in part on other grounds, 497 U.S. 62, 110 S. Ct. 2729, 111 L. Ed. 2d 52 (1990)), rev'd in part on other grounds without published opinion, 36 F.3d 1099 (7th Cir. 1994); see generally Note, *Choosing a Standard for Constructive Discharge in the Title VII Litigation, 71 Cornell L. Rev. 587 (1986).* Certainly no single incident stands out in the record as sufficiently hostile in and of itself to compel a reasonable person's departure; indeed, White herself relies on the cumulative effect of the allegedly discriminatory acts she [*16] has cited. Opening Br. at 9, 21; Reply Br. at 5. But even the totality of these acts does not support an inference that White was forced into a transfer. With the possible exception of one or two incidents, it appears that White was permitted at least one break daily n9; and she has not offered us reason to believe that being deprived of additional breaks made her work intolerable. The possibility that she was denied interim pay raises based on her accomplishments in training is potentially troubling, but the modest nature of these raises (ten to fifteen cents per hour at each step, *see* R. 68, Def. Ex. B at 51), not to mention the brevity of White's overall tenure in Chemical Processing, belies any notion that White had no choice to resign. *See Bourque v. Powell Elec. Mfg. Co., 617 F.2d 61, 65-66 (5th Cir. 1980)* (unequal pay and disappointment at failure to receive expected pay raise not sufficient to establish constructive discharge). Finally, the sexist remarks White has attributed to Huber and her co-workers, although offensive, were neither so demonstrably pervasive nor so severe that either alone or coupled with the other alleged injustices they would have compelled the [*17] reasonable employee to transfer to another department or another job.

n9 White's counsel indicated at oral argument that there were no more than two occasions on which White was denied a break altogether.

White has alluded to other problems in the course of this litigation, including inadequate safety training, the use of foul language by Huber and her co-workers, and not being given the chance to work overtime. These have been noted only in passing on appeal, without any discussion of the relevant evidence contained in the record. The district court addressed each of them, finding no evidence that White was treated differently because of her gender in these areas. In any case, we are confident that they do not help to establish a constructive transfer in this case: any shortcomings in safety training appear to have been limited to the first week or two of White's training n10; the cursing was not shown to have been so intense (or even out of the ordinary in the workplace) that a reasonable person might not [*18] have been able to bear it; and whatever overtime opportunities that might have been foreclosed to White were not so significant that without them she would be forced from the job *(cf. Bourque, 617 F.2d at 65-66).*

n10 White's concerns about inadequate safety training spring from a mishap that occurred early in her tenure when she was splashed with, although not injured by, hot steam while opening an evidently broken trap door. The district court examined the record as to this incident and found no evidence to support the notion that White was denied training on the basis of her sex. Mem. Op. and Order at 11-13. White has supplied us with no reason to believe this assessment was incorrect.

Many of the more noteworthy problems White purportedly experienced seem to have emanated from her difficult relationship with supervisor Dan Huber -- perhaps the quintessential heavy-handed manager. But "even if [Huber] were 'a heavy-handed manager who dealt poorly with subordinates[,] that kind of manager is (unfortunately) [*19] not a rare breed, and simple mismanagement does not constitute constructive discharge." *Phaup v. Pepsi-Cola Gen. Bottlers, Inc., 761 F. Supp. 555, 561 (N.D. Ill. 1991)* (quoting *Miller, 681 F. Supp. at 544).* Moreover, the record offers us little justification to deem White's entire experience in Chemical Processing unbearable due to Huber's possibly blunt management. White did, according to her own testimony, find support among Huber's superiors, and although she was also chastised for her attempts to circumvent him, she has not pointed to evidence suggesting that Dial, as her employer, effectively foreclosed every reasonable means of resolving her grievances except abandoning the A-5 position.

III.

White failed to produce evidence from which one might infer that a reasonable person would have felt compelled to transfer from Dial's Chemical Processing Department, as she decided to do. Consequently, the remedies of backpay n11 and reinstatement that White sought were precluded, and the district court was correct to enter summary judgment against White.

n11 White has not suggested that she also seeks compensation for the interim pay raise(s) she failed to receive while she still remained an A-5 trainee. The amount would no doubt be quite modest in any event, given the short period she worked in Chemical Processing.

**[*20]**

AFFIRMED.